U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED LAFAYETTE

APR 24 2015

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| DR. GEORGE T. MOENCH, ET AL | CIVIL ACTION 12-1536 |
| VERSUS | JUDGE HAIK |
| M/V SALVATION, ET AL | MAGISTRATE JUDGE HANNA |

## JUDGMENT

This matter involved an allision between the SES EKWATA, owned by the George T. Moench Irrevocable Trust, whose co-trustees are Dr. George T. Moench and Jennifer J. Aregood, and the M/V SALVATION, owned and operated by Marquette Transportation Company Inland Gulf, LLC ("Marquette"). The SES EKWATA was moored at the facilities owned by Basin Fleeting, Inc. ("Basin") at the time of the allision.

A trial was held in the above captioned matter on May 5-6, 2014. At that time, oral Rule 52 motions as to both damages and liability were argued by Marquette and **DENIED**. Basin joined in the motion for damages. An oral Rule 52 Motion for Liability by Basin was **GRANTED**. Based on the evidence presented at trial, the Court rules as follows:

## FACTUAL FINDINGS

In 2005, the SES EKWATA, a 116'x40' fiberglass trimaran, was purchased by the plaintiffs. The vessel is owned by the George T. Moench Irrevocable Trust, of which Dr. Moench and his daughter are the trustees. Dr. Moench had some construction experience and had owned various other vessels in his lifetime, some of which he refurbished on his own prior to purchasing the EKWATA (Doc. #136, Trial Transcript, Pages 9-12). Dr. Moench testified and

presented evidence that the vessel was essentially a hull when he purchased it, that he had completed significant renovations on the vessel prior to the allision, that he had lived on the EKWATA prior to the allision, and that he had plans to make the vessel his permanent home. The vessel did not have shafts and was without a rudder at the time of the incident.

On May 17, 2011, the United States Coast Guard issued Captain of Port Order 11-033 requiring the plaintiffs to move their vessel, the SES EKWATA, a fiberglass trimaran, from its location at 1681 Front Street in Morgan City, Louisiana, to a secure location prior to the opening of the Morganza Spillway Locks. The Coast Guard provided alternative docking locations, one of which was Basin Fleeting, Inc. located in Berwick, Louisiana ("Basin") Plaintiffs entered into an agreement with Basin, who towed and moored the EKWATA at its fleeting facility located on River Road in Berwick, Louisiana, located at Mile 122 of the Atchafalaya River and Mile 97 of the ICW on May 18, 2015. The United States Coast Guard rescinded the Order 11-033 once it was determined the vessel was properly moored.

On June 10, 2011 shortly before 1:00 a.m., the M/V SALVATION, owned and operated by Marquette Transportation Company Gulf Inland, LLC ("Marquette") and towing two barges, allided with the EKWATA. Captain Clyde Harrah was the pilot of the SALVATION at the time. Prior to the allision, the Captain was given orders by the Berwick Traffic Control to hold his position and stand by at a point in the navigational channel of the Atchafalaya River. The Captain was aware that there were higher than normal currents in that location at the time. (Doc. #136, Trial Transcript, Page 192, Line 2-4). The Captain held the position until he briefly left the controls for a cup of coffee, at which time he lost control of the vessel and was unable to recover. (Doc. #136, Trial Transcript Pgs. 201-204). The deck hand on duty who was supposed to be on watch was, instead, below deck when the situation arose and the allision occurred (Doc. #136,

Trial Transcript, Page 215, Lines 6-14). The Captain failed to sound the general alarm prior to the allision until immediately prior to contact (Doc. #136, Trial Transcript, Page 215, Lines 15-18). The Captain also failed to radio BERWICK VTS to let them know he was in trouble (Doc. #136, Trial Transcript, Page 215, Lines 10-20). Further, the Captain failed to use an assist boat once he lost control of the vessel. There are no records of the Captain calling for assistance or to warn at any time. There are no records of the Captain calling Basin Fleeting prior to making contact with its fleet.

At the time of the allision, the EKWATA was afloat (Doc. #136, Trial Transcript, Page 214, Lines 16-17) and was, according to Dr. Moench's testimony, in the process of being refurbished. The testimony of Joey Galloway, General Manager of Basin Fleeting, was that the EKWATA was lit at the time of the allision. (Trial Transcript, Doc. #136, page 305, line 19–page 306, line 3). Following the allision, the vessel was severely damaged and took on water. Additionally, the unrebutted testimony was that the vessel was vandalized post-allision, resulting in the loss of purchased equipment. (Trial Transcript, Doc. #136, page 33, line 19–page 36, line 13).

An intervention was filed in this matter on June 11, 2014 by Emile Leonard Price and Jo Marie P. Musso alleging the vessel was wrongfully on their land, on a sandbar, unmoored, and unlit. They alleged the vessel was a hazard to navigation. According to a Status Update filed by the plaintiffs on November 18, 2014, Dr. Moench had the vessel moved from the intervenor's property to a new location, where it was properly moored. Marquette Transportation notified the Court on February 20, 2015, however, that the vessel had been improperly moored and was, once again, set adrift. Duval Arthur, director of the St. Mary Parish Department of Homeland Security confirmed that the SES EKWATA had been adrift for a significant period of time, ultimately

colliding with a bridge in Berwick, Louisiana. The location of the vessel is currently unknown to the Court.

## LAW and APPLICATION

The plaintiff has argued that the presumption of fault set out in *The Oregon,* 158 U.S. 186 (1895) and the presumption of causation announced in *The Pennsylvania,* 86 U.S. 125 (1874) both apply to the instant case. The Court agrees. *The Oregon* allows a presumption of fault by a moving vessel when it allides with an anchored vessel or a fixed object. Such was the case here. The exceptions to the presumption of fault set out in *The Oregon* do not apply in this case as the Court does not find from the evidence that the defendant acted with reasonable care, the allision was the fault of the EKWATA, or that the allision resulted from an "inevitable accident." (*Id.* at 192.)

The EKWATA was properly moored, according to the United States Coast Guard, and stationary at the time it was struck by the defendant's vessel. (Trial Transcript, Doc. #136, page 32, lines 19-22) The evidence shows the defendant's captain had no lookout, was aware of the difficult conditions, and left the wheel of the vessel, resulting in the accident at hand.

*The Pennsylvania* sets out a presumption of causation. That is, when a vessel at the time of an allision is in violation of a statutory rule intended to prevent allisions it is presumed to be a cause of the accident. In order to exonerate itself, a vessel owner must show that the violation could not have contributed to the allision. As set forth in the evidence, Marquette failed to have a proper lookout, the vessel improperly came to a holding pattern in a navigation channel, the Captain worked excessive hours, the Captain left the wheel of the vessel in difficult conditions, the Captain failed to use an assist boat after losing control of his tow, and the Captain failed to failed to sound the general alarm. The evidence clearly supports a finding that these statutory

violations were the cause of the allision between the EKWATA and the M/V SALVATION.

In *In re: Mid-South Towning Co.*, 418 F.3d. 526 (5th Cir., 2005), the Court noted, "Evidentiary presumptions...are designed to fill a factual vacuum. Once evidence is presented...presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that give rise to the presumptions." In this matter, the Court finds the evidence clearly supports a finding of fault by Marquette without the application of either *The Oregon* or the *The Pennsylvania* rules, but applies the presumptions out of an abundance of caution.

## DAMAGES

The undisputed testimony of Mr. Galloway was that the EKWATA was afloat and had not been taking on water during its time in Basin's care. The testimony of the plaintiff established that the boat was a work in progress, but significant improvements had been made at the time it was struck. The testimony of Mr. Breit, Marquette's surveyor, was that the vessel was taking on water the day after the accident. (Trial Transcript, Doc. #137, page 522, lines 15-18). The undisputed testimony of several witnesses established that the engines and various other additions to the vessel were under water or water damaged following the allision.

The boat suffered significant damage from the allision as described in detail by Captain Strouse. There was compression damage; damage to the port side, an approximately 18 foot hole on the starboard side of the vessel, which river water and minnows were washing in and out of; a 12'x6' hole on the starboard pontoon bow; and various splits and fractures extending below the water line; and internal damage. Although Captain Strouse was unsure of the full extent of the damage as the vessel was not dry docked, he and all of the other witnesses admit the damage was extensive. (Trial Transcript, Doc. #137, page 461, line 23–page 464, line 20).

A vessel is considered a constructive total loss where the cost of repairs is greater than the fair market value of the vessel immediately before the casualty. *Ryan Walsh Stevedoring Co., Inc. v. James Marine Services, Inc.*, 792 F.2d. 489 (5th Cir., 1986). "In such a case repair is not economically practicable, and the market value of the vessel is the ceiling of recovery." *Gaines Towing & Transportation, Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir.1999). In *Tidewater Marine, Inc. v. Sanco Intern, Inc.*, 113 F.Supp.2d. 987, the Court noted, "As a general rule, market value should be established by evidence of contemporaneous sales of like vessels. *Standard Oil Co. v. Southern Pac. Co.*, 268 U.S. 146, 45 S.Ct. 465 (1925). The court may establish market value by other means as long as its judgment is reasonable. 'The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in proper consideration of all relevant facts.' *Id.* at 156, 45 S.Ct. 465."

The largest issue faced by the Court was the lack of credible expert testimony as to the damages and values at issue in this matter. The plaintiff's expert, Mr. Smith, without any credible supporting evidence or true comparables, estimated the pre-allision value of the EKWATA to be somewhere between $850,000 and $1.5 million dollars. The Court did not find this testimony carried a tremendous amount of weight given the underlying support for this opinion.

The testimony of Mr. Breit, Marquette's expert, was disappointing and unreliable, to put it mildly. Mr. Breit admitted to picking up a survey on the Ekwata and copying large amounts of information from it, included in his report, without ever realizing the information was for a completely different vessel named the FAT DUCK. (Trial Transcript, Doc. #137, page 531, lines 9-25). In fact, the FAT DUCK was approximately half the size and very much unlike the

EKWATA. He testified that, even upon discovering this grave error, it did not change his opinion as to the value of the vessel, which he placed at $50,000.00 or under. (Trial Transcript, Doc. #137, page 539, lines 19-21). He estimated the fair market value of the vessel without including any comparables, without considering the equipment on the vessel, without an accurate description of the vessel, and without reliable underlying information. He didn't even copy the incorrect name down correctly, referring to the vessel as the FAT CAT rather than the FAT DUCK. He opined the vessel was a constructive total loss with a value of under $50,000. If Mr. Breit was so careless in the preparation of his report, the Court does not have any confidence in his testimony. These were not minor details.

The testimony of Mr. Budwine was just as unconvincing. Mr. Budwine admittedly had not inspected an allision with a fiberglass hull in over 10 years prior this incident. (Trial Transcript, Doc. #137, page 583, lines 13-15). He further admitted that, even after visiting the vessel himself and knowing his job was to verify the work of Mr. Breit and Mr. Strouse, he not only failed to correct the <u>glaringly</u> incorrect information set forth in Mr. Breit's report, but incorporated it into his own. He also admitted that, although he was there to survey the vessel, he failed to take any measurements or notice that the vessel was approximately double the size he and Mr. Breit listed in their reports. (Trial Transcript, Doc. #137, page 587, line 14–page 588, line 18). Finally, Mr. Budwine admitted to not including all pertinent information in his report. (Trial Transcript, Doc. #137, page 596, lines 3-7).

Interestingly, Mr. Budwine admitted that he <u>never saw pictures of the pre-allision condition of the vessel</u> and that significant damage could have taken place in the 90 days that had passed between the allision and his inspection. (Trial Transcript, Doc. #137, page 590, lines 13-22). On the stand, Mr. Budwine adjusted his opinion of the vessel's value given the pictures

presented by the plaintiff which had never been provided to him by Marquette, even though they asked him to express an opinion as to pre-allision value. He estimated the value to be between $75,000 and $100,000. (Trial Transcript, Doc. #137, page 591, lines 9-15). He also opined that the repair costs would be "hundreds of thousands of dollars". (Trial Transcript, Doc. #137, page 603, lines 12-15). He testified that the vessel was a constructive total loss. The Court notes that neither Mr. Budwine's estimate, nor Mr. Breit's estimate included any of the equipment on the vessel.

The testimony of Larry Strouse was that the estimated cost of repairs was $285,000. He admitted, however, that this estimate was inconclusive of all of damage from the allision. (Trial Transcript, Doc. #137, page 468, lines 3-6). That is, he could not give an accurate damage estimate. Captain Strouse was unable to assess all of the damage, noting the boat would have to be dry docked to do so, but that the damage was substantial. (Trial Transcript, Doc. #137, page 464, lines 18-24). Although Captain Strouse was more credible than either of Marquette's other experts, the Court was left only to conclude that Captain Strouse's opinion was incomplete.

The fair market value in this case is not able to be determined by evidence of contemporaneous sales of like vessels as the EKWATA was, admittedly, a uncommon vessel and no such evidence was available or presented by either party. In that case, the Court is directed to look to other evidence. *Id.* at 155. As detailed above, the experts in this matter provided the Court with very little reliable or complete evidence as to the fair market value or amount of damages. Given the circumstances of this case and the lack of credible evidence, it is fair and reasonable for the Court to look to the actual financial investment by Dr. Moench to conclude a reasonable value of the vessel. That is, the amount he paid for the vessel and proven out of pocket costs for the improvements.

The evidence clearly established that Dr. Moench paid $200,000 for the vessel. He testified that he spent approximately $217,000 for improvements and $170,000 cash for labor. He also testified to spending "thousands of hours" working on the vessel. (Trial Transcript, Doc. #136, page 26, line 24–page 27, line 5). He had no receipts, cancelled checks, or evidence to support the claim of $170,000. Dr. Moench offered no receipts or evidence outside of the bank records showing a line of credit which he drew down on to support the claim for materials. He also provided no case law to support an award for the personal time he spent improving the vessel. Given the boat was only partially renovated, was without shafts, was never drydocked, was purchased without a survey, and did not have a large market for resale, the Court finds it is reasonable to establish the vessel's value was $417,000 at the time of the allision. That is the $200,000 Dr. Moench paid for the vessel, plus the $217,000 he claimed to spend on materials, given he provided a specific and detailed list of the materials at issue.

There was essentially no testimony in the way of repair costs. An exchange between the Court and counsel, and memoranda, revealed that Dr. Moench obtained a bid for repairs which he did not pursue as it was over $1 million. The testimony of Mr. Breit established that repairs would cost "hundreds of thousands" of dollars in his opinion. Captain Strouse's opinion that repairs would be in the range of $285,000 was, admittedly, incomplete and inconclusive. Given there was no testimony establishing a true repair cost and the undisputed testimony was that the vessel was severely damaged, the Court concludes the cost of repairs exceed the value this Court has placed on the vessel. Consequently, the vessel was a constructive total loss.

"It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed." *Standard Oil Co. Of New Jersey v. Southern Pacific Co.,* 286 U.S. 146, 45 S.Ct. 465 (1925). It is also established in law and fairness that injured parties mitigate their damages. In this case, Dr. Moench testified that he attempted to secure the vessel, but it was eventually vandalized and several items were stolen. Various items were also left onboard the vessel, undamaged, and other items he did not attempt to salvage. Although the general law is that a party is entitled to the fair market value of an item when there is a constructive total loss, it would be unfair to award damages for items that Dr. Moench could have reasonably preserved or removed from the damaged vessel.

Given the foregoing, the Court finds Dr. Moench is entitled to damages in the amount of **$322,890.00,** which includes the $200,000 he paid for the vessel and $122,890.00 in materials and equipment that were unsalvageable following the collision. The testimony went item by item through the materials and equipment both post and pre-allision on the vessel. The amount of damages concluded by the Court is based on the uncontested evidence as to value set forth by the plaintiff is Exhibit #27, and the Court finds it is reasonble given the fact no receipts or other hard evidence as to value was presented.

The Court is not awarding Dr. Moench disposal costs as all evidence before the Court establishes that, following the allision, the vessel was not properly secured or cared for, ultimately becoming a hazard to navigation. The result was a securing of the vessel by a third party, not Dr. Moench.

Generally, each litigant is responsible for the payment of his or her own attorney's fees. However, federal courts have the inherent power to award reasonable attorney fees and costs to the prevailing party under certain circumstances, including when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Hillman Lumber Products, Inc. v. Webster Manufacturing, Inc.*, 727 F.Supp.2d. 503 (W.D. LA, 2010). This Court is fully aware of the high bar set by the Fifth Circuit for the granting of such an award, however it feels the granting of reasonable fees is justified in this case.

Both before and during trial, Marquette clearly knew the extent of its liability based on the circumstances of the case and the actions of its captain. Marquette was fully aware of the fact that the plaintiff had no liability whatsoever for this allision. Marquette further knew that it had no credible evidence or legal support for a claim of liability on the part of Basin Fleeting. Marquette presented two experts who were so lacking they could not even properly name the vessel for which they were rendering a report. Mr. Breit was so unbelievable that he even refused to adjust his opinion as to value once it was discovered that he was actually rendering a report on a vessel that was <u>double the size and width</u> and <u>completely different</u> than the one he described. Marquette's position and its experts were disingenuous and abusive to the legal process.

Plaintiff stated in his Post-Trial Brief Regarding Damages (Doc. #124), "From the beginning, Marquette's (now clear) goal was to spend Plaintiffs into submission–to make this case too expensive to fight. There was never a good faith attempt to resolve this case, only to present Plaintiffs with the option of taking $40,000–far less than even the disposal costs. Or, alternatively, to litigate to the bring of Plaintiffs' insolvency. This bad behavior should not be countenanced." The Court agrees. Defendant's took the position throughout this litigation that

the vessel was a constructive total loss. The law clearly establishes that, when there is a constructive total loss, the fair market value of the vessel is the amount of damages due. Marquette presented a completely unreliable expert–insulting to both the plaintiff and the Court–who opined the value was under $50,000, with absolutely no support whatsoever and based on information in his report that referenced a separate vessel. It then presented Mr. Budwine as an expert who testified that Marquette never provided him with photographs of the pre-allision state of the vessel, even though he was asked to render an opinion on its pre-allision value, and that had the vessel been in the shape represented by plaintiffs at trial, he would value it at between $75,000 and $100,000. Yet, they only offered plaintiff $40,000, knowing the evidence, the price he paid for the vessel, and the cost to litigate. Marquette's conduct throughout this case was, in this Court's opinion, an abuse of the process and bad faith.

As such, the Court is awarding reasonable attorney fees to the plaintiff to be paid by Marquette. It is further ordered that the costs of litigation shall also be taxed to Marquette. The plaintiff shall provide satisfactory proof of attorney fees and costs within **ten (10) days of the date of this order.**

**Judgment is hereby rendered in favor of the plaintiffs and against Marquette Transportation Company Inland Gulf, LLC in the amount of $322,890.00, plus attorney fees and costs.**

THUS DONE and SIGNED on this ___24th___ day of ___April___, 2015.

RICHARD T. HAIK, SR., DISTRICT JUDGE